TradeComet.Com LLC v. Google, Inc.                                                    Doc. 1

# JUDGE BUCHWALD

# '09 CIV 1400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **TRADECOMET.COM LLC,** | : | CIVIL ACTION NO. _____ |
| **Plaintiff** | : | |
| | : | **COMPLAINT** |
| **v.** | : | |
| **GOOGLE INC.,** | : | **Jury Trial Demanded** |
| **Defendant** | : | |

*RECEIVED FEB 17 2009 U.S.D.C.S.D. N.Y. CASHIERS*

### NATURE OF THE ACTION

1.     Plaintiff TradeComet.com LLC ("TradeComet") brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendant Google Inc. ("Google") for injuries sustained by TradeComet by reason of Google's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  TradeComet demands a trial by jury.

2.     Google operates a search website and a search advertising platform on the Internet.  In response to search queries – on Google.com or on one of Google's syndicated search boxes on third-party websites – Google returns search-results pages with a list of "natural" or "algorithmic" results (typically on the left-side) and, where applicable, a list of paid search advertising or "sponsored links" (typically on the top and/or right-side).  Advertisers are drawn to, and willing to pay for (through an auction process described below), search-based ads like Google's "sponsored links" because these ads are displayed at the moment a user is potentially about to purchase a good or service as the result of a search query.

Dockets.Justia.com

3.      Google is the dominant provider of search advertising in the United States and has been investigated in the past 14 months by both United States federal antitrust enforcement agencies, the Department of Justice and the Federal Trade Commission.  In fact, in November 2008, according to an attorney (and former Assistant Attorney General of the U.S. Department of Justice) who was working with the Antitrust Division of the Department of Justice, the agency was a mere three hours away from filing a complaint against Google alleging, among other things, that Google has a monopoly in search advertising and that its conduct surrounding its search advertising pact with Yahoo! would have furthered its monopoly.

4.      TradeComet operates a competing search website known as "SourceTool.com" (or "SourceTool") that attracts highly-valued search traffic of businesses seeking to buy or sell products and services to other businesses.  This form of business-to-business search is commonly referred to as "B2B search" or "B2B exchange."  B2B search is one form of Internet search that Internet users may turn to for more specialized search results than those returned by a generic search website such as Google.  B2B search, and other forms of specialized search (e.g., video, local search, travel, medical, shopping comparisons and others) are commonly referred to as "vertical" search.  Search advertising platforms associated with vertical search websites, such as SourceTool, offer advertisers advertising platforms that compete with generic search websites such as Google.

5.      Vertical search sites like SourceTool are attractive to advertisers as an alternative to a generic search site like Google because the advertiser is aware that users will visit vertical search sites to find relevant results more quickly than having to sift through pages of irrelevant results on a generic search site.  For example, advertisers understand that a business user searching for "pumps" is more likely to be searching for a mechanical or hydraulic pump than

2

for a style of heeled women's shoes. Vertical search sites can deliver more relevant results because they are specifically catered to certain audiences and, as a result, are attractive to certain groups of search advertisers seeking the highly-valued traffic a self-selected audience brings.

6. Initially, SourceTool was a very successful company, rising to become the second-fastest growing website in the world. It advertised on Google and began to receive considerable search traffic. This success enabled both SourceTool and Google to generate significant revenue. As a result, Google embraced SourceTool's success and the quality of its service, naming it "Site of the Week."

7. Google recognized, however, that sites like SourceTool (individually and collectively with other verticals) posed a substantial threat to Google's dominance in search advertising and would attract highly-valued search traffic from Google and, as a result, advertisers from Google's highly profitable advertising platform (known as "AdWords"). Faced with this threat to its business, Google undertook a variety of actions to exclude vertical search sites from the search advertising market, including imposing exclusivity in its agreements with popular and highly-trafficked websites and targeting and excluding (through its auctions) sites that posed a gathering threat to Google's dominance. These actions were intended to starve nascent competition from vertical search sites, like SourceTool, of the critical search traffic necessary to develop and to compete in the search advertising market.

8. Accordingly, Google unilaterally terminated the voluntary course of dealing it had with SourceTool by, among other things, manipulating its auctions so that SourceTool faced vastly higher prices to acquire search traffic – prices so high that it was completely uneconomical for SourceTool to win auctions that it had routinely won prior to Google's exclusionary strategy. Google's anticompetitive conduct therefore strangled the primary source

3

of search traffic to SourceTool, resulting in substantial drops in traffic and revenue. Currently, SourceTool averages approximately 1% of the traffic that visited the site prior to falling victim to Google's exclusionary conduct. At the same time, Google sacrificed business arrangements that had been generating significant revenues and profits.

9.      Google further disadvantaged SourceTool in its ability to compete and to provide a competitive alternative for search advertisers to Google's dominant advertising platform by entering into "preferred" agreements with Business.com. These agreements were intended artificially to prop up Business.com in the search advertising market and, at the same time, to shield Google by diminishing and eliminating competitors that were not favored search sites of, and therefore not under long-term exclusive agreements with, Google.

10.     As a result of Google's exclusionary conduct and unlawful agreements, competition in the search advertising market has been harmed and TradeComet has been injured.

## PARTIES

11.     Plaintiff TradeComet is a Delaware limited liability company with its principal place of business in New York, New York.

12.     Defendant Google is a Delaware corporation registered with the State of New York to conduct business therein and has its principal place of business in Mountain View, California.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, Section 4 of the Sherman Act, 15 U.S.C. § 4, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

14.     Venue is proper in this district under 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b) and (c) because: (1) Google transacts business and is found within this district,

4

(2) TradeComet's principal place of business is within this district, and (3) a substantial portion of the events giving rise to the claim herein occurred within this district.

## TRADE AND INTERSTATE COMMERCE

15.     The activities of Google, individually and in conjunction with others, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

16.     During the time period covered by this Complaint, Google sold advertising as a result of online search queries throughout the United States and across state lines.

17.     Google's conduct had a direct, substantial and reasonably foreseeable effect on United States commerce.

## BACKGROUND FACTS

### *Natural Search and Search Advertising*

18.     In response to a search query entered by a user, search websites return a search-results page. Generally, a search-results page displays two different kinds of results: (1) natural or "algorithmic" results; and (2) search advertising results.

19.     On many search websites, natural or "algorithmic" results are shown on the left-side of a search-results page. Search websites normally generate their natural results by way of a "search algorithm." Search algorithms are computer programs that review a search website's index of Internet content and aim to return links to information relevant to the query.

20.     A search website's index of online content encompasses enormous amounts of information, which is routinely updated and stored on the search website's servers. Some search websites have broad-based or generic indices. Examples of companies that operate broad-based search websites include Google, Yahoo! and Microsoft. "Vertical" or specialized search websites typically focus their indices on specific categories of content. Examples of vertical

search websites include sites for health information, videos, comparison shopping and, as discussed below, sites such as SourceTool.com for business-to-business goods and services.

21.   Google's search engine creates and updates its index by continuously sending tools called "crawlers" to scan all the web sites on the Internet and to index the terms they find. Because of Google's dominant market position, it has become common for web site publishers to optimize their sites and content for Google's crawlers. Indeed, many publishers hire third party "Search Engine Optimizers" or "SEOs" that specialize in designing web sites to meet the evolving requirements of Google's algorithm and crawlers.

22.   Google's crawlers and algorithms are updated frequently forcing publishers to constantly re-optimize their sites for Google. As a result, Google's proprietary indexing technology has become the de facto standard on the Internet. Moreover, because web sites are optimized for Google's algorithms, they cannot be optimized as effectively for Google's existing and potential competitors, which creates barriers to new competition and reinforces Google's dominant position.

23.   As discussed below, search advertising results are returned using different processes than algorithmic results. Often search advertising results appear as "sponsored links" on the top, bottom or right-side of a search-results page.

24.   Search advertisements are normally sold on a "cost per click" or "CPC" basis whereby advertisers pay the search website each time their ad is clicked by a user of the search website. If a search ad is shown on a search-results page, but not clicked, then the advertiser generally does not pay. Most other forms of Internet advertising require an advertiser to pay based on how often an ad is shown to users.

### Google's Rise to Dominance

25.    Google was founded by Larry Page and Sergey Brin in the mid-1990s and began operations in Menlo Park, California, in 1998.

26.    By early 1999, the company's search website was receiving over 500,000 search queries per day, and the company had received an infusion of $25 million from venture capital firms in California's "Silicon Valley." (By way of comparison, SourceTool was receiving over 600,000 search queries per day when it became the victim of Google's exclusionary conduct.)

27.    Initially, all of Google's search results were natural search results derived from its "PageRank" search algorithm, which, like other search algorithms, purports to return links based on relevance to the search query.

28.    Search queries on Google continued to grow in the early 2000s as the company was able to partner exclusively with highly trafficked websites such as AOL/Netscape. By partnering with Google, a website would direct search queries to Google's search engine. The AOL/Netscape collaboration alone helped increase Google's searches to over 3 million per day. Google's growth continued throughout the late 1990s and early 2000s through the acquisition of, or partnering with, third-party websites to ensure Google's exclusive placement on these third-party websites.

29.    As Google's Chief Economist recognized, Page and Brin did not have a specific business model in mind for Google when they founded the company. Indeed, throughout much of its early history – and despite attracting significant Internet traffic to its website – Google made very little money. For example, according to Google's Chief Economist, at one point Page and Brin offered to sell their search technology (the "PageRank" algorithm discussed above) to Yahoo! for only $1 million. Yahoo! turned them down.

30.     Although Google began generating some revenue by permitting third parties to use its algorithmic search technology, it persisted in its failure to generate significant revenues.

31.     In 2001, Google introduced a search advertising platform known as "AdWords," which was based on the business model of GoTo.com (later renamed Overture and purchased by Yahoo!), a rival search platform. AdWords purportedly uses an auction to determine the price for ads displayed in response to queries for specified "keywords." Google's incorporation of its keywords auction soon translated into revenue as Google began to monetize the traffic at its website, which continued to increase due to the skyrocketing popularity of Internet search and through Google's exclusive partnerships with, and acquisitions of, third parties.

32.     Through AdWords, Google auctions keywords to advertisers. Keywords are words or character strings that, when typed into a search engine either alone or along with other search terms, result in the appearance of search advertising results on the search-results page. Advertisers bid on keywords in order to have their ads displayed on Google in response to user queries when the specified keyword is entered by the user into Google's search engine. Typically, the advertiser pays when a user clicks on an ad. However, because the user has launched a search using the keyword, a user that clicks on an ad is particularly likely to respond to the advertiser's message. The higher bidding advertisers tend to obtain better placement of their ads on the search results page and to realize higher "click through" rates. As discussed below, however, Google manipulates its auctions to favor certain advertisers over others.

33.     Google purports to auction keywords on AdWords using a form of what is commonly referred to as a "second-price" auction. Advertisers submit bids into AdWords based on the price they would pay if their search ad is shown and "clicked" by the user (i.e., a "price-per-click"). The "second-price" aspect refers to the fact that advertisers on AdWords typically

pay based on the ad ranked immediately below their own. The general theory is that the second price aspect of the platform provides more incentive to an advertiser to bid at or near what the ad actually is worth to them, since the advertiser will pay not its value of the ad, but rather the value of the next highest bidder for the keyword. Google's price-per-click auctions, however, are not pure auctions in which buyers and sellers set price without any influence on the part of Google. Google influences the price an advertiser ultimately pays in several ways. For example, Google establishes minimum pricing thresholds that can differ by advertiser based on criteria, such as "Landing Page Quality," that is exclusively in Google's control. Google therefore ultimately determines how many ads to place on its search-results pages, which ads to place and in which order. As a result, the advertiser with the highest bid does not always get the best slots on the page and, in many cases, that advertiser's ads are not shown at all. Google does not disclose the specific criteria used to determine the winners and losers of any particular auction.

34.     It is impossible to know how Google actually picks winners and losers of its auctions due to a lack of transparency that has led many in the industry to refer to Google's advertising system as a "Black Box." Google's Chief Economist has explained, however that by restricting the number of positions displaying ads on its website, Google can force advertisers to pay "far, far higher" amounts and that a "big chunk of revenue at Google" is derived from that strategy.

35.     In 2003, Google spent approximately $102 million to buy the rights to technology that allowed Google to sell advertising that would appear on third-party Internet websites. This service became known as "AdSense." Through AdSense any website operator (or "publisher") can present advertisements in the unused white space of its webpages. Generally, the AdSense advertisements that are displayed on a particular webpage are based upon the keyword content

contained on that webpage. The underlying advertiser must pay for each "click" by an Internet user on their AdSense advertisement. Such payments are then split between Google and the third party website.

36.     As a search advertising platform, Google survives solely by generating advertising revenue through traffic visiting, or directed to, its website. Google is a leading Fortune 500 company with a market capitalization of over $100 billion, annual revenue of over $16 billion and net profit of over $4 billion.

### *History of TradeComet*

37.     TradeComet was founded in 2005 by Dan Savage, a graduate of Harvard College and Harvard Business School and a veteran of the publishing and online search industries. Prior to founding TradeComet, Mr. Savage was the founder and CEO of ThomasB2B.com ("ThomasB2B"), a specialized B2B advertising platform. ThomasB2B, like Google, generated revenue from advertiser payments made on a cost-per-click basis. Prior to founding ThomasB2B, Mr. Savage worked as a Vice President for Thomas Publishing Company, a leader in the dissemination of industrial product information for over 100 years.

38.     Mr. Savage was an early and frequent user of Google's advertising auction. As early as January 2002, Mr. Savage, through Thomas Publishing Company, began advertising through Google AdWords. In April 2002, a Google representative recognized "that a huge opportunity exist[ed]" between Google and B2B publishers like Thomas Publishing Company.

39.     ThomasB2B's website launched in July 2004. Throughout 2004 and 2005, Mr. Savage continued to participate in AdWords auctions and to develop ThomasB2B's search advertising platform, securing significant amounts of money to acquire traffic with affiliates.

ThomasB2B continued operations until September 2005, at which time it ceased its search advertising operations.

40.     While at ThomasB2B, Mr. Savage developed a search website directed at B2B search. He realized that advertisers seeking to reach Internet users conducting business-oriented searches often considered specialized B2B search websites as a more attractive search advertising option than the predominant generic search websites at the time (Yahoo! and Google) due to the more targeted audiences visiting B2B sites. Mr. Savage therefore developed an advertising platform that blended a free searchable business directory (i.e., the natural search results) with bidding by advertisers for position on the website (i.e., the search advertising results or sponsored links similar to the approach utilized by Google).

41.     Mr. Savage sought to expand the model he initially developed at ThomasB2B by starting a new venture, TradeComet. As part of this effort, Mr. Savage raised significant money in funding for TradeComet, which began operations in September 2005 and went live in November 2005. One of TradeComet's initial investors was a company regulated under the New York State Certified Venture Capital Companies (CAPCO) program, which provides certain investors with state tax credits with the goal of promoting the formation and expansion of New York based businesses, thereby creating jobs and growth in the State's economy. TradeComet has its offices in New York, where a large concentration of advertisers and advertising agencies that rely upon search advertising are located. (These advertisers are adversely impacted by harm to competition in search advertising).

42.     As he had done with ThomasB2B, Mr. Savage developed SourceTool to attract B2B search queries by offering a searchable business directory available at no charge to users. SourceTool's directory contains information about more than 750,000 product and service

11

suppliers around the world indexed according to the United Nations Standard Products and Services Code. SourceTool allowed companies to post information about their businesses, including management and experience, as well as their product and service offerings. Plans for site development included uploading videos of business offerings and other novel methods of displaying products and services to users of the site.

43.     Mr. Savage realized that attracting search traffic required using Google's search advertising platform, which was becoming dominant, until SourceTool reached an audience size capable of sustaining the site. In order to attract traffic to SourceTool, in October 2005, TradeComet began purchasing several hundreds of thousands of keywords and phrases from Google's AdWords.

44.     Initially, SourceTool was remarkably successful. By March 2006, just three months after its launch, SourceTool was rated by ComScore as the second-fastest growing website in the world, based on a 58% growth rate from February to March 2006. Daily traffic to SourceTool during that time exceeded 600,000 visits.

45.     Google initially embraced SourceTool's success, and Mr. Savage was invited to Google's New York office in December 2005 to meet about his upstart business. The stated purpose of the meeting, according to Google, was to review SourceTool's placement of advertisements on its website and to discuss strategies to maximize revenue. In January 2006, a Google representative called Mr. Savage to inform him that the monetization of SourceTool was successful and that SourceTool had been selected as a "site of the week" at Google.

46.     Mr. Savage was invited to Google's New York office for a second visit in May 2006 to meet with several Google representatives to discuss further growth of SourceTool. At Google's specific request and urging, Mr. Savage, along with other TradeComet officers, shared

SourceTool's business plans, strategies, and growth goals. After the meeting, a Google representative stated that she was "excited to continue working with [TradeComet's] accounts to get [SourceTool's] advertising at an even higher level of performance." The following day, a Google representative expressed in an email how pleased Google was with SourceTool's increased AdWords usage. The Google representative requested that Mr. Savage be given access to a new beta version of Google's AdWords editor.

47. In the months following the May 2006 meeting, however, Google drastically raised the minimum bids for AdWords keywords on which SourceTool bid. For instance, Google increased prices to SourceTool by approximately 10,000% for many keywords; keywords that previously cost between 5 and 10 cents were increased to $5 and $10.

48. As a result of the inability to obtain keywords and thus search advertising from AdWords, SourceTool was unable to secure traffic to its website. Given the growing dominance of AdWords, there was no realistic alternative to which SourceTool could turn to generate sufficient traffic to return to the growth path on which SourceTool had been prior to Google's exclusionary actions. The loss in traffic over the next several months resulted in a coinciding drop in SourceTool's advertising revenues. SourceTool estimates that from March 2006 to December 2006 it lost approximately 90% of its monthly traffic from Google and millions of dollars in revenue.

49. Mr. Savage raised this issue in August 2006 during another meeting with Google. Google explained that the recent drastic keyword price increase was not due to any increase in demand for the keywords on which SourceTool was bidding, but rather was due to SourceTool's poor "landing page quality," as assessed by Google's new "Landing Page Quality algorithm" – a concern Google had never raised in its previous meetings with TradeComet's management and

that Google expressed mere months after declaring SourceTool a "site of the week." In fact, prior to the meetings at which Mr. Savage revealed TradeComet's business plan at Google's specific request, Google had extolled the virtues of SourceTool in communications with TradeComet's management. During the meeting in August 2006, however, Google representatives specifically acknowledged Google's concern about competitive threats to its search advertising business.

50. Nonetheless, at Google's suggestion, TradeComet initiated several changes to SourceTool designed to improve (in Google's estimation) the site's landing page quality assessment. These changes were costly and were made in spite of TradeComet's belief that they would not improve the user experience at the SourceTool website. In fact, B2B search marketers had already expressed their praise of SourceTool's original and novel design prior to Google's actions to block traffic to SourceTool.

51. In September 2006, Mr. Savage contacted Google and described the specific actions TradeComet had taken at Google's request. Mr. Savage also explained that TradeComet had planned to raise millions of dollars in additional venture capital funding for SourceTool, but it was becoming impossible to do so because Google's exclusionary actions were now thwarting SourceTool's business success. Google replied through a representative that it would review the situation.

52. Google contacted Mr. Savage in December 2006 to inform him that Google had conducted a manual review of SourceTool and concluded that Google would not make any changes to reverse its actions that had been blocking traffic to SourceTool through the artificially-inflated minimum bids for keywords sought by SourceTool.

53.     Mr. Savage again pleaded with Google but was tersely informed that "[y]our landing pages will continue to require higher bids in order to display your ads, resulting in a very low return on your investment.  Therefore, AdWords may not be the online advertising program for you."  Google also stated that it "realize[s] that we are in a unique position and are always mindful of the impact our policy decisions will have before we implement them."

54.     Search advertising is critical to nascent competitors like SourceTool, which must identify a needle (a B2B search query) in a haystack of web searches.  Search advertising permits affirmative targeting of search traffic rather than waiting for those needles to show up from the haystack of natural searches or from far less efficient forms of advertising like display advertising.  Over time, as vertical search sites like SourceTool obtain "critical mass" through search advertising, web users initialize their search there.

55.     Because of Google's dominance, no other search advertising provider could provide SourceTool with the necessary traffic for the site to continue its growth, which left TradeComet with no viable competitive alternative after being cut off from Google's AdWords.

### The Relevant Market

56.     The relevant market in this case is the provision of advertising as a result of online search queries in the United States (the "Search Advertising Market").

57.     Search advertising platforms tend to be localized by country due to differences in language and geography and other country-specific factors.  Many search advertisers therefore, set their advertising campaigns on the basis of country.

58.     Search websites compete for advertisers in a variety of ways, including, without limitation, through the ease of use of the advertising platform, the format of ads, the policies and

procedures of the advertising platform, the number of search users or amount of "search traffic," and the rate of return offered to advertisers.

59.     Increased search traffic translates into a greater number of clicks on search ads and thus more revenue for the search advertising platform. More search traffic also tends to attract more search advertisers to the search advertising platform. As Google's Chief Economist acknowledged, "advertisers follow the eyeballs." These characteristics contribute to what is commonly referred to as the scale or network effects of online search. Google's Chief Economist has recognized that "search technology exhibits increasing returns to scale" and that "scale is pretty critical to the business." Substantial search traffic draws advertisers desiring to target such traffic. Conversely, with less search traffic, there are fewer clicks and less revenue for the search advertising platform. Search advertisers are far less likely to devote resources to advertising on the search-results page of lightly trafficked search websites. The presence of network effects therefore serves as a barrier to entry.

60.     Search websites seek to attract search traffic through a variety of methods, including advertising their search website to potential users and attempting to design appealing user interfaces and better search algorithms. Success in obtaining search traffic is a prerequisite for successfully competing within the Search Advertising Market. As a Google representative stated, "we think that if we get more high quality content online, that improves search, and when you improve search people use search more and that ultimately causes us to sell more ads."

61.     Search advertising is a distinct relevant market because there are no effective competitive alternatives to search advertising available for search advertisers. Search advertisers view the placement of advertising on search-result pages to be distinct from other types of advertising. Websites designed to generate advertising in response to search queries allow

advertisers a unique opportunity to have ads displayed in real-time at a point where a user has revealed information that permits the serving of targeted and relevant advertisements. This form of advertising, thus, is more likely to deliver ads in real-time to users desiring to purchase goods and services. As a result, search advertisers do not consider other types of advertising to be close substitutes for search advertising.

62. Search advertising platforms also do not generally consider other types of advertising in determining how to market or price their search advertising. When search advertising platforms consider whether to make changes to their systems, they consider the extent to which search advertisers might switch to other search advertising providers, but they do not focus on the extent to which search advertisers might switch to types of non-search advertising. A Google Vice-President recently acknowledged that "[t]he old way of advertising had no direct interaction with the audience. But now the audience can click. So suddenly advertising is not a sales pitch. It's a response to an expression of intent. This form of advertising is narrowcast, personalized. It has very different properties than the old."

63. Google dominates the Search Advertising Market with a monopoly share (of at least 70%) through its AdWords platform – a share that continues to increase. Both federal antitrust agencies – the U.S. Department of Justice and the U.S. Federal Trade Commission – and more than a dozen state attorneys general have recently had occasion to review Google's business and have found Google to be the dominant supplier of search advertising. According to the F.T.C., "Google, through its AdWords business, is the dominant provider of sponsored search advertising, and most of its online advertising revenue is generated by the sale of advertising." Google's principal rivals in the market for search advertising are Yahoo! and

Microsoft, each of which also provides general purpose search websites; however, those two competitors have far lower shares of the Search Advertising Market than does Google.

64.     Vertical search advertising platforms also account for a small percentage of the Search Advertising Market. Although currently much smaller than the larger generic search advertising platforms operated by Google, Yahoo! and Microsoft, vertical search platforms are capable of delivering highly relevant results because they are specifically catered to their self-selected visiting audiences and are a source of potentially significant competition to generic sites like Google. Although vertical search platforms currently present a nascent competitive threat to Google, if they are permitted to develop and grow, those sites individually and collectively represent a threat of attracting substantial amounts of traffic from Google and of providing alternative search advertising platforms to AdWords.

65.     As vertical sites reach a critical mass of search queries, they too, like Google, can support keyword auctions for advertisers, as planned by TradeComet. Google's Chief Economist has stated that in situations where "you have a niche or focused market" advertising "is extremely powerful . . . because you are showing ads that people are interested in almost by definition." This is due to the fact that, as one Google representative stated, "even with the most rudimentary user information, search engines can and will provide drastically better search results."

66.     As Google learned during the course of its meetings with SourceTool during the first half of 2006, SourceTool planned to compete for B2B search traffic in order to draw advertisers to its site. SourceTool also planned to reinstate the blended directory-keyword auction that Mr. Savage developed and implemented at ThomasB2B once SourceTool reached critical mass in terms of search traffic. At that point, SourceTool would be able to present

advertisers seeking highly valued B2B search traffic a more focused competitive alternative to Google's generic, yet dominant, AdWords platform.

### Google's Conduct to Raise Barriers to Entry and to Exclude Competition

67.     There are substantial barriers to entry in the Search Advertising Market. The primary barrier to entry facing vertical search websites is the inability to draw enough search traffic to reach the critical mass necessary to become independently sustainable. Google has dramatically raised this barrier to entry in numerous ways.

68.     Google has entered into exclusive agreements with many of the most highly trafficked websites on the Internet, guaranteeing that any search generated at those non-search websites (and, increasingly, rival search websites as well) is directed to Google's search advertising platform rather than to rival platforms in the Search Advertising Market. These exclusive agreements establish Google as the website's search provider and deny rival search advertising platforms, including vertical search advertising platforms, the ability to create switching opportunities for users and advertisers to alternative search sites. As just one example of many, Google entered an agreement with AOL having the effect, as described by AOL, of "dedicat[ing] [AOL's] search business to Google on an exclusive basis." AOL expressly acknowledged that the exclusivity requirement could limit AOL's ability to take advantage of competing search technologies in the future.

69.     Search syndication agreements like these reinforce Google's dominant position by, among other things, ensuring that web searchers only view Google's platform rather than becoming accustomed to rival platforms. The Department of Justice recently concluded that Google has a dominant share in the relevant market for such search syndication at publisher websites.

70.     Google's conduct has deprived rival advertising platforms of the scale necessary to become effective competitors to Google's dominant AdWords platform.  Google's own 10-K admits that its exclusive search syndication contracts with an overwhelming number of significant Internet publishers are not always profitable: "Payments to certain of our Google Network members have exceeded the related fees we receive from our advertisers."  Yet, locking up that inventory has foreclosed a substantial percentage of the search syndication market to the detriment of Google's search advertising rivals and vertical search rivals who would otherwise benefit from greater entry possibilities and increased competition in the Search Advertising Market.

71.     Google also recently sought to raise barriers to entry, to entrench its dominant position and to exclude competition in the Search Advertising Market further by entering into an agreement with Yahoo! whereby Yahoo! would outsource a critical part of its keyword auctions to Google.   Under this arrangement, Google advertisements would replace Yahoo! advertisements in a large number of instances.  As a result, Google would have dictated the pricing for these ads and would have been further empowered to manipulate keyword auctions (and the subsequent pricing to advertisers) to drive competition from the Search Advertising Market and to protect Google's dominant position.  At the same time, the agreement would have eliminated Google's principal competitor and increased Google's "network effects" and scale advantages.

72.     The Department of Justice concluded that the agreement between Google and Yahoo! would "harm competition in the markets for Internet search advertising and Internet search syndication."   Google abandoned the agreement in response to the Department of Justice's investigation a mere three hours before the Department would have filed a complaint

alleging, among other things, that Google had a monopoly and that the advertising pact would have furthered its monopoly in violation of Section 2 of the Sherman Act.

73.     Moreover, there is no basis for Google's requirement that the syndication agreements discussed above include exclusivity, as Google's proposed agreement with Yahoo!, for example, included no such provision.

74.     Google has also sought to raise barriers to entry, to exclude competitors and to reinforce its dominant search advertising platform by restricting advertisers' ability to use data generated while using AdWord's Application Programming Interface ("API") to facilitate switching to other search advertising platforms.  When an advertiser runs a campaign on AdWords, it sets and routinely adjusts its bids for the auctions of keywords.  The number of keywords bid upon by a single advertiser can run into the hundreds of thousands.  Through its AdWords API policies, Google effectively restricts the ability of advertisers to transport and use data from AdWords campaigns to perform management and analysis of search campaigns across search advertising platforms.  Google's API restriction unnecessarily impedes the ability of advertisers to use competing search advertising platforms and inhibits the development of software that would encourage and enable advertisers to use multiple competing search platforms, rather than being forced to limit their advertising to Google's dominant platform.

75.     Google has sought to raise barriers to entry, to exclude competitors and to reinforce its dominant search advertising platform through the use of "default defenders" – restricting the ability of users of Google's "toolbar" to change their default search engine to something other than Google.  Initially, Google's toolbar software automatically and without the user's permission resets Google as the default search engine in the event the user tried to change it.

76.     On information and belief, Google sought to raise barriers to entry, to exclude competitors and to reinforce its dominant search advertising platform by configuring its natural algorithmic results to favor its own products to the detriment of its competitors. For example, on information and belief, Google has configured its natural search results to disadvantage MapQuest.com, a pioneering provider of maps, by returning links to Google Maps results higher than links to MapQuest.com in Google's natural search results. Similarly, on information and belief, Google has configured its natural search results to the detriment of its competitor Clicksor.com.

77.     Google's dominant share of the Search Advertising Market and the high barriers to entry facing entrants evince Google's monopoly power in the relevant market.

78.     There is also abundant direct evidence of Google's monopoly power including its ability unilaterally to raise prices (as it did for SourceTool), its ability to exclude competitors, its ability to force advertisers – at Google's whims – to pay higher prices for positioning on its web pages and its ability to erect and to raise barriers to entry in the Search Advertising Market.

### The Competitive Threat Vertical Search Poses to Google

79.     In addition to the competitive threat posed by other generic search engines and related search advertising platforms, at least by the middle of 2006, Google recognized that vertical search engines, both individually and collectively, represent a nascent threat to Google's dominance in search and search advertising. Vertical search websites offer advantages not available at larger generic search websites like Google. For instance, vertical search websites draw users whose search profile is known even before they enter a query based simply on the fact that such web searchers have chosen a specialized web search destination. These search websites include B2B search, such as SourceTool, as well as other specialized search websites,

22

including retail shopping comparison sites, travel search sites, automobile search sites, job search sites, real estate search sites and many others.

80.    Vertical search websites also are capable of delivering extremely precise, and therefore highly relevant, results because they are customized for a particular item, category of items, or field.

81.    Accordingly, there is positive feedback available at vertical search websites like SourceTool. In particular, SourceTool invested in B2B customization because it expected to draw (and did draw) users seeking to purchase goods and services from businesses. Those users were willing to conduct their searches on SourceTool because they understood that the search results were customized to the specific subject area of which they were interested, namely, B2B search. The user therefore avoids having to search page upon page of irrelevant results simply because a generic search engine like Google does not readily distinguish "pumps" to be a hydraulic pump or a heeled shoe. Advertisers seek to display ads on vertical search sites like SourceTool because they understand these sites are capable of attracting focused and highly valued search traffic.

82.    Google realizes that vertical search advertising platforms are a threat to Google's revenues and dominant position in the Search Advertising Market. As discussed above, vertical search sites by their nature allow searchers to self-select the general area in which they wish to search. As searchers become better informed, they will initiate their search query at vertical search sites, rather than at Google, to obtain search results that are more finely tuned to their needs. For example, travel search alone is a highly lucrative search advertising business and presently comprises a significant and increasing share of Google's search advertising revenue. Similarly, were YouTube still an independent vertical video search site (it has been acquired by

Google), it would rank second in terms of search site traffic, ahead of Yahoo! and Microsoft, and only behind Google. By acquiring YouTube, Google both extinguished a competitive threat to its dominant advertising platform and increased the barrier to entry in the Search Advertising Market by eliminating a large independent source of potential search traffic. As these examples make clear, Google faces huge losses if vertical search succeeds in drawing highly valued search traffic from Google's generic search engine along with advertisers from Google's dominant AdWords platform.

83.    Google's actions indisputably evince its acknowledgment of B2B search as a key area for search advertising. Google has sought to secure B2B advertisers in a number of ways, including by publishing an "AdWords Technology Business-to-Business Newsletter," which is "designed to help Tech B2B advertisers get the most out of Google AdWords and other Google products." As early as March 2002 – when Google accounted only for approximately 28% of Internet searches – Google sought advertising from B2B companies claiming that Google was an "Effective Marketing Tool for . . . Reach[ing] Existing Customers Online . . . Acquiring New Customers" among other things. In fact, at that time, Google noted that there were "[o]ver 2.3 Billion B2B Searches every month" and bragged that "Google Users are Well Educated & B2B Decision Makers."

84.    As discussed above, vertical search is a direct threat to Google's highly lucrative AdWords platform (which is the primary source of Google's wealth and profits). A vertical search engine or a collection of vertical search engines attracting highly valued search traffic would soon attract advertisers away from AdWords and lessen Google's grip on search advertisers.

85.     Google has acknowledged the threat posed by the proliferation of vertical search websites through other specific actions.  For instance, at the time of the May 2006 meeting in New York with Mr. Savage, Google announced that it would launch Google Co-op Custom Search Engine, dubbed a "Vertical Search Killer" by certain industry watchers.  At that time, a Google representative stated that with Google Co-op "people can create vertical searches [using Google]" and therefore "provide[] a deeper search experience inside the main search on specific topics."  This same Google representative stated that by letting companies and individuals build their own specialized search engines, it will also create competition for the many new vertical search products that have recently been launched on the web.

86.     Google further acknowledged the threat vertical search poses to its dominance when it launched its Co-op Custom Search Engine in October 2006.  A Google representative made clear the reasons for the launch:  "Google has taken a step back and looked at the general issue of vertical search - and as a result has introduced Google Custom Search Engine."

87.     As it does with its general purpose search, Google displays AdWords ads alongside the results returned from a Google Co-op Custom Search Engine search.  As part of the roll-out of Google Co-op, Google created at least two vertical search engines in health and city guides.

88.     Google has also sought to develop or acquire numerous vertical search websites.  For example, in April 2002 Google launched Google news, which allows vertical searches of new stories.  In December 2002, Google launched Froogle, now known as Google Product Search, a price comparison vertical search website.  In November 2004, Google launched Google Scholar, which allows vertical searches of scholarly literature indexed by Google.  In October 2005, Google launched Google Code Search, which allows vertical searches of computer

programming code. In March 2006, Google launched Google Finance, which allows vertical searches of financial and business information. In October 2006, Google agreed to buy YouTube, which hosts video content and is a video vertical search website. As mentioned, searches on YouTube alone – were it still owned independently – would make it the second most used search site on the Internet. In December 2006, Google launched Google Patents which allows vertical searches of U.S. patents.

89.     More recently and in recognition of the increased attractiveness of vertical searches to search users, Google has completely reconfigured its broad-based web search so as to incorporate various vertical searches into the returns. Google has dubbed this change "Universal Search," to counter the inroads made by vertical search websites. As a result, Google's search website now returns results not only from its natural search results from the Internet, but also results of searches of its various vertical search websites such as video, shopping comparison results, finance information and others. At the same time that Google was developing these strategies for vertical search, as discussed below, it was developing and executing plans to eliminate existing, and nascent, competition from independent vertical search sites like SourceTool.

90.     Google's public statements also indicate Google's concern over losing advertising revenue to vertical search advertising platforms. For example, in 2007, a Google representative stated that with respect to vertical search websites "its likely that the innovations are going to come in these smaller side applications and then ultimately those companies will either be acquired or partnered or in some way we will develop that same type of functionality in a one stop shop." As discussed above, Google's Chief Economist has stated that in situations where

"you have a niche or focused market" advertising "is extremely powerful . . . because you are showing ads that people are interested in almost by definition."

### *Google's Anticompetitive Conduct Directed Toward Vertical Search Competitors*

91. Like other search advertising platforms, Google's business model relies upon its ability to monetize search traffic. In Google's case, this traffic predominantly originates from Google.com, affiliates that have syndicated Google search boxes, and Google toolbars on browsers. Given its dominant share of search queries (Google received 63.5% of all search queries on the Internet in November 2008 according to ComScore) and of the Search Advertising Market (at least 70%), Google has positioned itself as the tollbooth of the Internet. Google has acknowledged that any search traffic diverted from its search advertising platform is lost advertising revenue.

92. In defending Google's monopoly position, Google's Chief Economist has acknowledged Google's vulnerability of having traffic diverted to other search websites by repeatedly suggesting that competition is "a click away." In order to avoid competition on the merits, however, Google has exercised its dominance in the Search Advertising Market and engaged in a series of exclusionary conduct intended to eliminate competition from search advertising platforms.

93. Faced with the threat that vertical search advertising platforms may, both individually and in the aggregate, divert qualified search traffic and advertisers from its generic search advertising platform, Google has undertaken steps to exclude the rival vertical search sites, including SourceTool, from the Search Advertising Market. These steps include, foremost, starving rivals and nascent competitors of search traffic by entering exclusive agreements with highly-trafficked websites and by directly eliminating rivals through the application of Google's

"Landing Page Quality" metric, which targets and obstructs traffic to specific rivals that pose a threat to Google's revenues and dominance in the Search Advertising Market.

94.     Google invests heavily in efforts to target and remove competitors directly through its "Landing Page Quality" metric. This mechanism allows Google to apply artificial "quality" scores to each ad displayed on its website resulting from the AdWords auctions. The quality score attached to a particular ad is purportedly based upon the amount of money the related keyword is expected to generate as well as the "relevance" of the ad to the searcher's query. Google ascribes a "quality" basis for this plainly exclusionary conduct, but its targeted application (or relaxation) of the algorithm demonstrates that Google is in full control of this "quality" metric and may operate it in a manner that eliminates competition rather than simply as a method to bolster quality. On information and belief, Google began using Landing Page Quality in 2005 to filter ads placed on its search results webpage.

95.     On information and belief, Landing Page Quality is determined both by application of an algorithm and by human review. This hybrid approach further affords Google an opportunity to exclude specific rivals and to provide inequitable results, as it did when it excluded SourceTool in 2006, or to rescue favored sites (in which, on information and belief, Google has a special financial or other interest) from application of the exclusionary filter.

96.     The use of Landing Page Quality allows Google to cut off search traffic to selected sites by artificially increasing the bids those sites must submit in order to win a keyword auction. Reports of advertisers facing drastic increases in minimum bids necessary to win a keyword auction are common in the industry, with many advertisers reporting increases of 2,000% up to 10,000%, as Google applied to SourceTool.

97. In fact, Google has admitted that vertical sites such as travel aggregators and comparison shopping sites will likely merit low landing page quality scores. On information and belief, Google seeks to prevent advertisements placed on AdWords to link to websites that similarly display advertisements with search results.

98. On information and belief, Google's Landing Page Quality measure is applied only to advertisements to be displayed on its website as part of its AdWords platform; Google applies no similar quality or relevance metrics to advertisements that it displays on publishers' websites under its AdSense platform.

99. Google offers limited and incomplete information for advertisers about its Landing Page Quality methodology. As discussed above, Google refused to provide specific reasons for the dramatic increases SourceTool faced in its minimum bids after Google applied its Landing Page Quality methodology. Google also deprives potential vertical search threats by diverting traffic from their sites in less transparent ways including, on information and belief, unfavorable placement of their ads or distorting natural search results.

100. Google has entered into agreements with "search partners" chosen by Google, such as kellysearch.com and Business.com, that also disadvantage rivals and harm competition. According to a Google representative, these agreements are with "a hand-full [sic] of 'strategic partners' who have been with us from day one and invested in Google when we were unknown, therefore they do receive privileges outside of our other relationships." As part of these agreements, Google provides those partners with preferred treatment in the display of the partners' ads on Google's search results pages. Also as part of these agreements, Google provides preferential treatment with respect to the ads it will serve to the partners' websites.

Also, on information and belief, Google does not engage in the same obstructive conduct to block traffic to these preferred partners as it does with other rival sites like SourceTool.

101. On information and belief, Google relaxes its Landing Page Quality methodology for certain "search partners" that Google selects. The relaxation of the Landing Page Quality methodology for these partners also confirms that quality and relevance is not Google's sole objective. At the same time, the relaxation of the Landing Page Quality methodology for certain of Google's partner's – and for Google's own sites – provides them with an unfair and anticompetitive advantage over rival advertisers offering similar services.

102. The actions described above, and Google's decision unilaterally to terminate its voluntary course of dealing with TradeComet, blocked SourceTool's primary source of traffic through exclusionary means. At the same time, Google ensured that its "search partners" continued to receive the critical search traffic necessary to survive. As a result of its conduct, Google decimated the traffic to SourceTool and terminated profitable dealings. Google has discontinued, and (or) refused to enter into these profitable arrangements in order to exclude potential and nascent competitive threats like TradeComet from the market.

103. Because appearing on Google is critical for any Internet business, Google's exclusionary conduct in maintaining its monopoly power in the Search Advertising Market has unreasonably harmed competition, injured advertisers and ruined competitors. Google's exclusionary conduct entrenching Google's search as a "must buy" for advertisers has hastened dwindling competition in the Search Advertising Market to the detriment of vertical search competitors in particular. Innovation and the development of new and more efficient search advertising has been retarded, and entrants have seen the consequences of Google's exclusionary

conduct, smothering competition in the Search Advertising Market that poses a threat to Google's dominance.

***Count I***
***Monopolization of the Search Advertising Market***
***in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2***

104. Plaintiff repeats the allegations above as if fully set forth herein.

105. Google possesses monopoly power in the Search Advertising Market. Through the anticompetitive conduct described herein, Google has willfully maintained, and unless restrained by the Court will continue willfully to maintain, that power by anticompetitive and unreasonably exclusionary conduct. Google has acted with an intent illegally to maintain its monopoly power in the Search Advertising Market, and its illegal conduct has enabled it do so, in violation of Section 2 of the Sherman Act.

106. As a direct and proximate result of the acts and practices alleged above, TradeComet is being and will continue to be immediately and irreparably injured through the following:

> A. The loss of profits that otherwise would have been earned in the Search Advertising Market;
>
> B. The loss of market presence for SourceTool, as well as the loss of market share that would otherwise have been achieved had Google not acted unlawfully to harm competition, and to seek to eliminate SourceTool from the Search Advertising Market;
>
> C. The substantial reduction in the value of the assets associated with SourceTool;
>
> D. The loss of good will in the Search Advertising Market; and

E. The loss to TradeComet of skilled engineering, product development and marketing personnel.

107.   The precise amount of damages that TradeComet is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

108.   In addition, Google's monopolization of the Search Advertising Market is an ongoing wrong causing incalculable and irreparable injury for which there is no adequate remedy at law. Unless Google is restrained by an appropriate Order of this Court, TradeComet will be unable to compete fully and fairly in the Search Advertising Market.

### *Count II*
### *Attempted Monopolization of the Search Advertising Market in Violation of Section 2 of the Sherman Act,* **15 U.S.C. § 2**

109.   Plaintiff repeats the allegations above as if fully set forth herein.

110.   On information and belief, by the mid-2000's, the Defendants attempted to monopolize the Search Advertising Market in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

111.   Defendant Google is the dominant competitor in the Search Advertising Market and even as of 2005 held a market share in search advertising in excess of 50%. Google engaged in a number of anticompetitive acts to increase barriers to entry in the Search Advertising Market and to provide it with monopoly power in that market. At least as early as 2005, Google attempted to become a monopolist through various exclusionary acts described above including, but not limited to, entering into exclusive agreements with highly trafficked websites to deny competitors the ability to attract search traffic as well as to initiate targeted strategies to eliminate competition such as the development and implementation of its Landing Page Quality metric, which Google also used to block nascent competitors from obtaining needed search traffic. After

learning about TradeComet's business plan, Google also took specific actions to eliminate TradeComet as discussed above.

112.    Through its exclusionary acts, Google specifically intended to monopolize the Search Advertising Market.

113.    Given Google's dominance with regard to the Search Advertising Market, Google's ability to erect barriers to entry, Google's proven ability to eliminate competition and the exclusionary conduct described above, there is a dangerous probability that Google will succeed (or has already succeeded) in acquiring monopoly power in the market for Search Advertising.

114.    By reason of Google's illegal attempt to monopolize, TradeComet has been and is threatened with being injured in its business and property and is entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

### *Count III*
### *Unreasonable Agreements in Restraint of Trade*
### *in Violation of Section 1 of the Sherman Act,* **15 U.S.C. § 1**

115.    Plaintiff repeats the allegations above as if fully set forth herein.

116.    The relevant market is the Search Advertising Market. Google and Business.com are both participants in the relevant market. Google dominates and controls this market through its dominant market share and its actions, as described above, to raise the barriers to entry in this market and exclude competitors. Business.com is a vertical search site that specializes in B2B search and attracts advertisers desiring to display ads to the highly valued B2B search traffic drawn to Business.com and other B2B sites, including SourceTool.

117.　On information and belief, Google and Business.com have entered into an agreement (or agreements) that grants Business.com preferential treatment by, among other things, relaxing many of the limitations that Google imposes upon competitors, including SourceTool. Through this agreement with Business.com, Google avoids enhanced competition in the Search Advertising Market and the diminishment of its lucrative AdWords platform; it also maintains control over a key vertical through its relationship with Business.com.

118.　On information and belief, the agreement between Google and Business.com allows Google to sell advertisements for Business.com's search queries. In effect, this allows Google to extend its position in B2B search by selling ads for its direct competitor. Moreover, because Google has not starved Business.com of traffic like it has for TradeComet, Business.com has a significant advantage over TradeComet and other B2B vertical search engines that have not entered into preferential agreements with Google.

119.　The purpose of the agreement between Google and Business.com is to diminish and eliminate the competitive threat that vertical search sites such as SourceTool pose to Google's dominant position in the Search Advertising Market and artificially to prop up Business.com as the predominant search site in this key vertical with the intent and effect of preserving Google's control over the Search Advertising Market. By diminishing the ability of rivals like SourceTool to enhance their search capabilities on equal footing with Google's preferred partners – like Business.com – barriers to entry are raised, competition is harmed and choice and quality are impaired. As a result, advertisers are less likely to gravitate to rival vertical search sites like SourceTool.

120.　As a result of these illegal contracts, combinations, agreements, and conduct, competition in the Search Advertising Market has been or is threatened to be restrained in

violation of Section One of the Sherman Act, 15 U.S.C. § 1. TradeComet has been injured in its business property by reason of these illegal contracts, combinations, agreements, and conduct and is therefore entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## JURY DEMAND

121.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

a.  That Google's willful acquisition, maintenance and use of monopoly power, and its attempt to acquire such monopoly power, by exclusionary means discussed herein violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.  That Google's agreement with Business.com unreasonably harms competition and injures TradeComet in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.  That judgment be entered for Plaintiff against Google for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

d.  That Plaintiff be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

e. That equitable relief be issued in the form of an injunction prohibiting the ongoing exclusionary conduct, and unreasonable agreements entered into, by Defendant;

f. That Plaintiff have such other, further or different relief as the case may require and the Court deems just and proper under the circumstances.

Respectfully Submitted,

February 17, 2009

Charles F. Rule
Jonathan Kanter
Joseph J. Bial
Daniel J. Howley
CADWALADER, WICKERSHAM & TAFT LLP
1201 F St. NW
Washington, DC 2004
Tel:    (202) 862-2200
Fax:    (202) 862-2400

joseph.bial@cwt.com